1
2
3
4
5
6
7
8

9          UNITED STATES DISTRICT COURT

10          SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  RMS NA, INC.,<br><br>13                                 Plaintiff,<br><br>14  v.<br><br>15  RMS (AUS) PTY LTD, an Australian<br>limited proprietary company; RMS<br>16  GLOBAL PTY LTD, an Australian<br>limited proprietary company; P & J<br>17  BUTTIGIEG NOMINEES PTY LTD, an<br>Australian limited proprietary company;<br>18  PETER ANTHONY BUTTIGIEG, an<br>individual; JENNIFER LYNN<br>19  BUTTIGIEG, an individual; ASCOTT 2<br>PTE LTD, an Australian limited<br>20  proprietary company; ADVENT<br>21  PARTNERS 3 FUND LP, an Australian<br>limited proprietary company; and DOES<br>22  1–100<br>23<br>24                                 Defendants. | Case No.:  24-cv-01366-AJB-MMP<br><br>**ORDER DENYING PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>**(Doc. No. 8)** |

25

26          Presently pending before the Court is Plaintiff RMS NA, Inc.'s *ex parte* application

27  for a temporary restraining order ("TRO"). (Doc. No. 8.) Defendant RMS (Aus) Pty Ltd.

28

1

("RMS Australia")[1] filed an opposition in response. (Doc. No. 16.) The Court heard oral arguments on the application on October 10, 2024, at 2:00 p.m. For the reasons provided in detail below, the Court **DENIES** Plaintiff's application for temporary restraining order.

## I.   BACKGROUND

RMS Australia is an Australian company that develops and produces software ("RMS Software") for use in the hospitality industry for various types of booking services. (Complaint ("Compl."), Doc. No. 1, ¶ 18.) Plaintiff is a Delaware corporation formed by Reza Paydar for the purposes of the joint operation of RMS NORTH AMERICA LLC (the "Joint Venture"), with its principal place of business in San Diego County, California. (*Id.* ¶¶ 9, 19.)

### A.   The Operating Agreement

On March 31, 2011, Plaintiff and RMS Australia entered into a Second Amended and Restated Limited Liability Company Agreement (the "Operating Agreement") for the Joint Venture. (*Id.* ¶¶ 9, 20.) The express goal for establishing the Joint Venture was for marketing and distributing the RMS Software in North America. (*Id.* ¶ 20; Operating Agreement, Doc. No. 1-2, at 6 (Recitals § F).)

To that end, Plaintiff and RMS Australia agreed they would "each bring expertise and skills to the business of the Company, and therefore, each have certain responsibilities to advance the business of Company[.]" (Operating Agreement § 6.7.) Specifically, Plaintiff and RMS Australia outlined in Section 6 of the Operating Agreement that RMS Australia would develop and maintain the RMS Software, while Plaintiff would handle marketing:

> **6.7.1**  RMS [Australia] shall have the responsibility for (i) providing full software and customer support to the Business, (ii) new software development required for the Market, (iii) training as needed of Company

---

[1] The memorandum of points and authorities in opposition to the *ex parte* application for a temporary restraining order is submitted on behalf of all defendants. (Doc. No. 16 at 7 n.1.) However, because the only relief requested in the motion is directed toward RMS Australia, the briefs and this Order focus on RMS Australia. (*Id.*)

personnel, and (iv) contributing to the Company the source code for the software used in the Market.

    **6.7.2** [Plaintiff] shall be responsible for (i) product launch and marketing, (ii) feedback to RMS for upgrades and enhancements for the Market, and (iii) payroll and accounting support.

(*Id.*) Each party represented it "is acquiring its interest in the [Joint Venture] for the Member's own account as an investment and without an intent to distribute the interest[.]" (*Id.* § 6.5.3.)

Plaintiff and RMS Australia also agreed to provide initial capital contributions to the Joint Venture in exchange for 50% membership interest in the Joint Venture and an equal distribution of any profits. (*Id.* § 8.2; Doc. No. 1-2 at 40.) The Operating Agreement also provided that the failure of either Plaintiff or RMS Australia to keep up with capital contributions would result in a dilution of its ownership interest in the Joint Venture according to an express formula. (Operating Agreement § 8.3.) The Operating Agreement further provided that if either Plaintiff or RMS Australia wished to dispose of "all or a portion" of its interest in the Joint Venture, it had to seek approval of the Management Committee. (*Id.* § 11.1.) The Management Committee at all times consisted of Mr. Paydar and Mr. Buttigieg, the Managing Director of RMS Australia and an owner of RMS Australia, RMS Global, and P&J Buttigieg Nominees Pty Ltd ("P&J"). (*Id.* § 7.1; Compl. ¶ 5.) Thus, the sale or transfer of either Plaintiff's or RMS Australia's interest in the Joint Venture required the other's permission.

Regarding conflicts of interest, the Operating Agreement allows for transactions between a Member and the Joint Venture, so long as "either (i) the transaction is fair to the [Joint Venture] or (ii) the disinterested Members, knowing the material facts of the transaction and the Member's interest, authorize, approve or ratify the transaction." (Operating Agreement § 6.6.2.)

A dispute later arose among Plaintiff and RMS Australia, and thus on October 2, 2018, they entered into the Second Amendment to the Operating Agreement (the "Second

Amendment"). (*See* Second Amendment, Doc. No. 8-2, at 52–66.) In the Second Amendment, Plaintiff and RMS Australia further clarified their respective duties. Specifically, Plaintiff and RMS Australia confirmed that RMS Australia "is responsible for product development, databases hosting, security maintenance, customer support, QA, training and installation," and Plaintiff "is responsible for all marketing, sales and seeking new customers for Canada, United States, Mexico and South America markets[.]" (Second Amendment § II.) Plaintiff and RMS Australia also memorialized that "the ultimate goal is for [the Joint Venture] to be autonomous to locally manage [the American market] customer expectations including marketing, training, product set up, installation[,] dedicated local QA team and customer support, and databases management." (*Id.*) Plaintiff and RMS Australia further clarified their goal was "to have an exit strategy to sell [the Joint Venture] including the RMS [S]oftware within the next few years and for [the Joint Venture] to be autonomous and independent at the time of the sale." (*Id.*)

The Second Amendment also detailed RMS Australia's duties as follows:

- "[M]anag[ing] the customer expectations and resolv[ing] the customer RMS [software] issues in collaboration with the local [Joint Venture] customer account managers[,]" (*id.* § IV(iii));
- "Training of new [Joint Venture] employees and customers[,]" (*id.* § V);
- "Product set up and installation," (*id.* § VI);
- Hiring, training, and covering all costs for all "[d]evelopers and programmers," (*id.* § VIII);
- "[P]rocurement of system hardware and network infrastructure . . . [and] dedicated technical staff . . . [for] monitoring and maintenance of customer databases," (*id.* § XI);
- Product customization for clients, (*id.* § XIV);
- Establishing a "local [Joint Venture] quality assurance team to perform regression testing and verification[,]" (*id.* § XV); and
- Depositing the source code for the RMS Software in an escrow account, with updates thereto and the configuration and documentation needed for installation and operation to be deposited into the escrow account at least annually, (*id.* § XVI).

The Second Amendment also provided that the Parties were required to keep their respective capital accounts above a $100,000 balance. (*Id.* § IXX [sic].) Failure to do so

4

would result in dilution of the delinquent Party's interest, according to the same formula detailed in Section 8.3 of the Operating Agreement. (*Id.*)

As previously discussed, the sale of RMS Australia's interest in the Joint Venture required the Management Committee's prior approval. (Operating Agreement § 11.1.) This provision ensured there would be no disruption to the Joint Venture's operations. (Declaration of Reza Paydar ("Paydar Decl."), Doc. No. 8-2, ¶ 6.) That provision and others require, in part, that before any transfer of a Member's interest is effective, the transferring Member provide "an opinion of counsel satisfactory to the Management Committee that such assignment is (a) subject to an effective registration under the registration requirements of applicable state and federal securities laws; or (b) is exempt therefrom[;]" tax related information from the assignee and other "information and agreements as the Management Committee may reasonably require[;]" and "[t]he consent of the Management Committee." (Operating Agreement § 11.1.2–4.) Moreover, the transferring Member must provide notice of the proposed transfer to the non-transferring Member, who then has the right of first refusal. (*Id.* § 11.2.1.) Plaintiff asserts RMS Australia failed to take these actions prior to transferring its interests in RMS Australia to various third parties—the remaining Defendants in this case. (Paydar Decl. ¶ 6.)

Under the Operating Agreement, an "impasse" occurs if the Management Committee fails "to consent to or approve any of the following actions, after any such action has been proposed by one of the members of the Management Committee: . . . (ii) to sell or exchange all or any substantial part of the Company Property . . . ." (Operating Agreement § 1, "Impasse".) "An Impasse shall be considered to have occurred if the Management Committee is unable to agree with respect to any of the foregoing actions within ten (10) days after any such action has been proposed." (*Id.*) Upon the occurrence of an Impasse, either party may then initiate the Agreement's "Put-Call" provisions. To begin the Put-Call process, either Member may make an "Offer" to acquire all of the other Member's interests in the Joint Venture. (*Id.* § 11.3.) The Member initiating the Offer is known as the "Offeror" and the other Member is referred to as the "Offeree." (*Id.* § 11.3.1.)

5

The Offer must state the "Aggregate Asset Price" at which the Offeror would be willing to purchase all of the Company Property, as defined in the Operating Agreement. (*Id.* § 11.3.2(b).)

Upon making an Offer via the delivery of a "Put-Call Notice," the Offeree has three options. First, within 180 days of receipt of the Put-Call Notice, the Offeree can accept the Offer. (*Id.* § 11.3.3.) If the Offeree accepts the Offer, then the Offeror is deemed the "Buyer" and the Offeree is deemed the "Seller," and the parties must follow the Put-Call Closing Procedures under Section 11.3.4 of the Operating Agreement. (*Id.* § 11.3.3(a).) Second, the Offeree can reject the Offer, in which case the Offeree is then deemed the "Buyer" and the Offeror is deemed the "Seller." (*Id.* § 11.3.3(b).) Under either of these options, the parties must then move forward to a closing, which must take place on the sixtieth day after the date of acceptance or rejection, or an earlier date that the Buyer elects within ten days' notice. (*Id.* § 11.3.4.) If the Buyer fails to perform its obligations under the Operating Agreement by the Closing Date, then the Seller "shall have the option, exercisable within sixty (60) days after the original Closing Date, to . . . continue the Company as if no put-call procedure had been implemented except that the Buyer shall be deemed to have consented to the non-agreed action which precipitated the Impasse[.]" (*Id.* § 13.3.5(a).) The third option is that the Offeree can do nothing, in which case the Offeree is deemed to have consented to the proposal that precipitated the Impasse. (*Id.* § 11.3.3.)

## B.    Factual Background

The parties respectively assert it met is obligations under the Operating Agreement while the other failed to perform. (*See* Paydar Decl. ¶ 8; Doc. No. 16-1 at 9–11.) On January 11, 2024, Mr. Buttigieg sent Mr. Paydar a letter stating "the Management Committee has failed to perform its required function of making '[t]he ordinary and customary decisions concerning the business affairs of the [Joint Venture]' under the Operating Agreement. Moreover, [Plaintiff] has routinely refused to acknowledge or otherwise take action with respect to proposals or requests for information from RMS Aust in its capacity as a member of the Management Committee." (Doc. No. 16-1 at 13.) Thus, P & J Buttigieg OS

6

Investments Pty Ltd, a company owned by Mr. Buttigieg, Ms. Buttigieg, and P&J, "has offered to purchase all of the [Joint Venture]'s Company Property . . . for an amount which would enable the [Joint Venture] to resolve its outstanding liabilities and subsequently dissolve . . . ." (the "Purchase Offer"). (*Id.*) Plaintiff did not respond to the Purchase Offer. (Declaration of Peter Buttigieg ("Buttigieg Decl."), Doc. No. 16-1, ¶ 12.)

Thereafter, on January 23, 2024, Mr. Buttigieg followed up with another letter, stating "[t]he Management Committee has failed to consent or approve RMS Aust's Proposal within ten days of the Proposal. Accordingly, an 'Impasse' has occurred[,]" and invoked the Operating Agreement's Put-Call provisions (the "Put-Call Offer"). (Doc. No. 8-2 at 161.) Plaintiff responded by rejecting RMS Australia's offer, which then made Plaintiff the buyer under the terms of the Operating Agreement, and stated the "[c]losing of the RMS Purchase shall take place on September 19, 2024[.]" (*Id.* at 169; *see* Operating Agreement § 11.3.3.) Thereafter, Mr. Buttigieg sent an email to the employees of the Joint Venture, claiming there was "an intractable impasse" between Mr. Paydar and Mr. Buttigieg and informing them of RMS Australia's Put-Call Offer. (*Id.* at 164.)

Moreover, at some point, Defendants Mr. Buttigieg, Ms. Buttigieg, and P&J restructured RMS Global as the sole member of RMS Australia. (Paydar Decl. ¶ 7.) Then, without informing Plaintiff, Mr. Buttigieg, Ms. Buttigieg, and P&J sold more than a combined controlling share of their interest in RMS Global to Defendants Ascott and Advent. (*Id.*; *see* Doc. No. 8-2 at 70–110.) Plaintiff asserts RMS Australia failed to comply with any of the requirements set forth in the Operating Agreement. (Paydar Decl. ¶ 6.)

Plaintiff thereafter filed the instant case. (*See* Compl.) After filing the Complaint, Plaintiff's counsel states he discussed with counsel for RMS Australia that the Parties informally agree to maintain the status quo pending the resolution of the instant action, should Plaintiff be forced to complete the purchase in the absence of RMS Australia satisfying its obligation to establish an infrastructure sufficient for the Joint Venture to run autonomously. (Declaration of Jacob Spaid ("Spaid Decl."), Doc. No. 8-4, ¶ 2.) Defendants' counsel did not provide a direct response. (*Id.*)

Thereafter, on September 19, 2024, the final date set by Plaintiff to complete the purchase, Plaintiff's counsel sent a letter to Defendants' counsel stating Plaintiff "has not received any correspondence from RMS AUS stating its intent to honor of the terms of the Operating Agreement and proceed with the Sale" and requesting "that the parties delay the closing date of the Sale for a 90-day period to resolve the RMS systems issues . . . and to permit the Court time to rule on a motion for preliminary injunction." (Doc. No. 8-3 at 5–7.) In response, Defendants' counsel stated it "was not obligated to 'stat[e] its intent to honor the terms of the Operating Agreement and proceed with the Sale'" and demanded that Plaintiff deliver "by the close of business, today, both: payment, 'in immediately available funds' of the 'Price,' *i.e.*, USD 2,624,189; and a release that releases RMS AUS from 'all acts and conduct relating to the [Joint Venture] . . . .'" (Doc. No. 8-3 at 11–12.) Plaintiff failed to respond to the letter or otherwise deliver either the Price or the Mutual Release to RMS Australia by September 19, 2024. (Buttigieg Decl. ¶ 21.)

Because Plaintiff failed to perform its obligations under the Put-Call provisions, RMS Australia elected to exercise its right to "continue the Company as if no put-call procedure had been implemented except that the Buyer shall be deemed to have consented to the non-agreed action which precipitated the Impasse[.]" (Doc. No. 16 at 15; *see* Operating Agreement § 11.3.5(a).) Accordingly, on Friday, September 20, 2024, RMS Australia executed an asset purchase agreement with P&J, pursuant to which it sold all of the Company Property of the Joint Venture. (Doc. No. 15 at 15–16.) The Joint Venture also voted to dissolve itself, filed a Certificate of Cancellation with the Delaware Secretary of State, and made distributions to the Members of the Joint Venture. (*Id.* at 16.) RMS Australia then delivered a check for Plaintiff's share of the Joint Venture's assets, totaling $2,226,487. (*See* Doc. No. 8-2 at 171.) Defendants thereafter purported to create a new entity, RMS Cloud North America LLC ("RMS Cloud"), transfer all the Joint Venture's assets to RMS Cloud, fire several Joint Venture employees, and inform others that they now work for RMS Cloud. (Paydar Decl. ¶ 15; *see* Doc. No. 8-2 at 175–181.) Moreover, the escrow agreement, pursuant to which certain "Deposit Materials" had been made

available to the Joint Venture by RMS Australia, was terminated, and the escrow agent has since confirmed its destruction of the Deposit Materials. (Buttigieg Decl. ¶ 29.)

The Operating Agreement is governed by Delaware law. (Operating Agreement § 15.5.)

## II.   LEGAL STANDARD

A temporary restraining order may be granted upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition[.]" Fed. R. Civ. P. 65(b)(1)(A). The purpose of such an order, as a form of preliminary injunctive relief, is to preserve the status quo and prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974). A request for a TRO is evaluated by the same factors that generally apply to a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). However, a TRO is an "extraordinary remedy" and is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). Instead, the moving party bears the burden of demonstrating four factors: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted). Additionally, under an alternative approach, an injunction may issue where there are "serious questions going to the merits" and "a balance of hardships that tips sharply towards the plaintiff." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III.   DISCUSSION

Plaintiff moves *ex parte* for a temporary restraining order in this case "to maintain the Parties' status quo pending the outcome of this action." In response, RMS Australia contends Plaintiff's *ex parte* application should be denied because Plaintiff failed to follow Judge Battaglia's Civil Case Procedures for *ex parte* applications, that Plaintiff lacks

9

standing, the relief sought is not in the Complaint, and Plaintiff fails to meet the standard for a mandatory TRO. (*See* Doc. No. 16.)

This Court's Civil Case Procedures clearly state the moving party is to contact opposing counsel prior to filing the motion to meet and confer, and that all *ex parte* motions will be accompanied by a declaration documenting their various efforts. Civ. Case Proc. III.1. RMS Australia states that on September 20, 2024, Plaintiff's counsel requested a meet and confer. (*See* Doc. No. 8-4 at 6–8.) That same day, RMS Australia's counsel indicated they could find availability on either September 23 or 24 for the meet and confer. (*Id.* at 7.) RMS Australia's counsel also asked that Plaintiff identify the specific relief it would be seeking. (*Id.* at 6–7.) Plaintiff's counsel agreed to September 23, 2024, and stated the relief it sought, and RMS Australia's counsel followed up requesting "a copy of your injunction papers and the caselaw which supports your request for relief so we can have a constructive discussion." (*Id.* at 6.) Plaintiff's counsel did not respond, and instead filed the instant *ex parte* application without further comment. (Doc. No. 16 at 18.) As part of its *ex parte* application, Plaintiff attaches the Declaration of Jacob Spaid, stating they "attempted to accomplish a meet and confer call with Defendants' counsel, but . . . was unable to do so prior to filing the moving papers for a temporary restraining order." (Spaid Decl. ¶ 3.)

While the parties did not accomplish a meet and confer call, Plaintiff's counsel provides evidence that it contacted opposing counsel prior to filing the instant application, and attached a declaration documenting their efforts. Moreover, despite any purported procedural deficiency, the Court finds it important to address whether a temporary injunction is warranted in this matter.

### A.    Standing

RMS Australia contends Plaintiff does not identify any threat of future harm, separate and apart from past injury, and thus the motion should be denied. (Doc. No. 16 at 18.)

///

"To obtain preliminary injunctive relief, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury." *Wolfe v. Logan*, No. 2:22-cv-06463-JLS-PD, 2023 WL 2347133, at *3 (C.D. Cal. Jan. 2, 2023) (quoting *Matthews v. Ryan*, No. 18-03740, 2020 WL 3050571, at *2 (D. Ariz. June 8, 2020)). "Past injury is not sufficient to confer standing." *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009)).

In its motion, Plaintiff requests the Court to "revive the subject entity" and acknowledges that Defendants "dissolve[d] the Joint Venture . . . ." (Doc. No. 8-1 at 5, 13, 18.) Indeed, Plaintiff attaches to its motion the Certificate of Cancellation of RMS North America, filed with the State of Delaware, (Doc. No. 8-2 at 173–81.) However, as argued by Plaintiff at the hearing, the dissolution of the Joint Venture can theoretically be undone, and the Parties could thereafter continue to operate the entity. Because RMS Cloud is currently running operations, paperwork could be done to revive the Joint Venture. This could then be conveyed to customers and clients to avoid further dissolution of goodwill.

Because Plaintiff has identified a threat of future harm in the further dissolution of goodwill, the Court finds Plaintiff has standing to bring the instant application.

**B.     Temporary Restraining Order**

**1.     Likelihood of Success on the Merits**

Plaintiff asserts it is likely to succeed on the merits for several reasons. First, there was no Impasse sufficient for RMS Australia to trigger the Put-Call provisions of Section 11 of the Operating Agreement. (Doc. No. 8-1 at 14.) Second, RMS Australia lacked standing under the Operating Agreement to trigger the Put-Call provision. (*Id.* at 16.) Finally, Plaintiff is likely to establish that it complied with all obligations under the Operating Agreement and is entitled to the benefit of the bargain, including by having RMS Australia establish sufficient infrastructure to have the Joint Venture operate independent of RMS Australia. (*Id.* at 17.) The Court addresses each argument in turn.

///

///

### a.      Different Character From the Underlying Suit

As to Plaintiff's first two arguments, RMS Australia asserts Plaintiff's motion should be denied because the relief sought bears no connection to the conduct alleged, or the relief sought, in the Complaint. (Doc. No. 16 at 19.)

"A preliminary injunction is appropriate when it grants relief of the same nature as that to be finally granted." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). To determine whether the preliminary and final relief are of the same character, "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Id.* (adopting the rule in *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)). "This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." *Id.*

RMS Australia asserts this required relationship is missing for two reasons. First, Plaintiff's Complaint focuses on RMS Australia's purported breaches of the Operating Agreement, and does not challenge the validity of the purported Impasse or RMS Australia's invocation of the Put-Call provisions, all of which occurred before August 1, 2024, when Plaintiff filed the Complaint. (Doc. No. 16 at 19.) In contrast, Plaintiff's *ex parte* application claims for the first time that there was no Impasse, and that RMS Australia was not permitted to trigger the Put-Call provision. (Doc. No. 8-1 at 14–16.) RMS Australia asserts this "new position directly contradicts" Plaintiff's prior written invocation of the benefits of the Impasse and the Put-Call provisions. (Doc. No. 16 at 19 (citing Doc. Nos. 8-2 at 169, 7-3 at 5–7).) Second, RMS Australia argues Plaintiff's requested relief, to "revive" the Joint Venture and maintain the status quo, is not requested in the Complaint, and thus the application must be denied. (*Id.* at 20.)

The Court finds a sufficient nexus exists between Plaintiff's request for a TRO and the claims in the Complaint. Although Plaintiff's arguments regarding an Impasse, the Put-Call provisions, and maintaining the status quo were not raised in the Complaint, the underlying harm—the erosion of the Joint Venture's value and goodwill—remains the

12

same. Plaintiff's Complaint asserts in part that "Defendants' true intention was to have Plaintiff perform the 'ground work' in the American markets, then fail to perform RMS Australia's obligations to devalue the Joint Venture and obtain it at a deflated value." (Compl. ¶ 93.) Moreover, the Prayer for Relief requests "injunctive relief and specific performance, including that RMS Australia place into escrow the most current version (and all prior versions) of the RMS Software source code, and that Defendants establish a local technical infrastructure to allow Plaintiff to run the Joint Venture autonomously upon Plaintiff's purchase of the Joint Venture[.]" (*Id.*, Prayer for Relief ¶ 5.) In the instant motion, Plaintiff requests the Court require RMS Australia to maintain the "status quo," which relates to the allegations alleged in the Complaint regarding RMS Australia's failure to perform its obligations. *See Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 868 (S.D. Cal. 2019) ("Plaintiffs' [preliminary injunction] claims regarding the Asylum Ban and Plaintiffs' underlying claims in their SAC are so intertwined that denying Plaintiffs' Motion for Preliminary Injunction could effectively eviscerate the asylum claims Plaintiffs seek to preserve in their underlying suit."); *Williams v. Navarro*, No. 3:18-CV-01318-DMS (RBM), 2019 WL 2966314, at *4 (S.D. Cal. July 9, 2019) ("The character of relief requested in the Motion, i.e., increased law library access, relates to conduct alleged in the Complaint, i.e., denial of the right to law library access.").

### b.    Whether There Was an "Impasse"

Thus, the Court turns to whether there was an Impasse sufficient for RMS Australia to trigger the Put-Call provisions of Section 11.

As an initial matter, RMS Australia responds that under Delaware law, Plaintiff should be equitably estopped from disputing that an Impasse occurred because Plaintiff attempted to utilize the Impasse and the Put-Call to its own benefit. (Doc. No. 16 at 24–25.) "Equitable estoppel precludes a party 'from asserting rights which might perhaps have otherwise existed[] . . . against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right.'" *Dep't of Health & Hum. Servs. v. Pelletier*, 964 A.2d

13

630, 635 (Me. 2009) (quoting *Waterville Homes, Inc. v. Maine Dep't of Transp.*, 589 A.2d 455, 457 (Me. 1991)) (alterations in original). "Equitable estoppel requires a misrepresentation. A misrepresentation need not consist solely of an affirmative statement; it may arise through a combination of misleading statements, conduct, or silence." *Id.* at 636 (citations omitted).

After receiving RMS Australia's January 23 Put-Call Offer in which it declared an Impasse, Plaintiff similarly invoked the Operating Agreement's Put-Call provisions, declared itself the "Buyer," and unilaterally set the closing date for the transaction as September 19, 2024. (Doc. No. 8-2 at 169 (citing § 11.3.3(b) of the Operating Agreement).) However, RMS Australia has failed to allege facts that would generate a successful defense based on equitable estoppel. The facts do not indicate RMS Australia was led to change its position for the worse due to Plaintiff's conduct, nor is there evidence Plaintiff acquired "some corresponding right."

Next, Plaintiff argues that because the January 11 Purchase Offer was made by Mr. Buttigieg on behalf of his separate entity, P & J Buttigieg OS Investments Pty Ltd, it was a conflicted proposal. (Doc. No. 8-1 at 14–15.) To this point, Plaintiff argues the proposal was not fair to the Joint Venture, nor did Plaintiff approve or ratify the proposal, and thus the January 11 Purchase Offer could not have created an Impasse to trigger the Put-Call provisions. (*Id.* at 15.)

RMS Australia responds that nothing in the Operating Agreement requires that an Impasse be prompted only upon consideration of a "fair" or "non-conflicted" offer. (Doc. No. 16 at 25 (citing Operating Agreement § 1, "Impasse").) It further asserts the Operating Agreement merely requires the "failure of the Management Committee to consent to or approve . . . [a proposal] . . . to sell or exchange all or any substantial part of the Company Property." (Operating Agreement § 1, "Impasse.") RMS Australia also asserts the cases relied upon by Plaintiff do not stand for the proposition that an "unfair" or "conflicted" offer from a member of an LLC is invalid. (Doc. No. 16 at 25.) Rather, such an offer might

give rise to a claim for breach of fiduciary duty, which was not raised here or mentioned in the Complaint. (*Id.* at 25–26).

The Court finds RMS Australia's argument unavailing. As noted above, Section 6 of the Operating Agreement states:

> No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if either (i) the transaction is fair to the Company or (ii) the disinterested Members, knowing the material facts of the transaction and the Member's interest, authorize, approve or ratify the transaction.

(Operating Agreement § 6.6.2.)  Here, RMS Australia's January 11 Purchase Offer, stating "that P & J Buttigieg OS Investments Pty Ltd (the '<u>Buyer</u>') has offered to purchase all of the JV's Company Property[,]" was a proposed transaction with the Joint Venture in which RMS Australia had a direct interest. (Doc. No. 16-1 at 13.) Accordingly, the transaction was voidable if it was unfair to the Joint Venture, or if Mr. Paydar—as the disinterested Member—did not authorize, approve, or ratify the transaction. And indeed, because Mr. Paydar's vote was the unanimous vote among the disinterested members of the managing committee, Plaintiff has shown a likelihood of success in asserting there was a conflict of interest. *See In re Tri-Star Pictures, Inc., Litig.*, No. CIV. A. 9477, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995) (noting the Delaware "Supreme Court's command in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983), that directors who have a conflict of interest relating to a proposed transaction should totally abstain from participating in the board's consideration of that transaction"); *Lockton v. Rogers*, No. CV 2021-0058-SG, 2022 WL 604011, at *1 (Del. Ch. Mar. 1, 2022) ("When, however, [corporate decision-makers] venture outside those bounds [of fiduciary duties]—as when causing the company to undertake a transaction in which they are themselves interested—their actions draw stringent judicial review.").

However, an "impasse" occurs if the Management Committee fails "to consent to or approve . . . [a] propos[al] by one of the members of the Management Committee: . . . (ii)

15

to sell or exchange all or any substantial part of the Company Property . . . ." (Operating Agreement § 1, "Impasse".) "An Impasse shall be considered to have occurred if the Management Committee is unable to agree with respect to any of the foregoing actions within ten (10) days after any such action has been proposed." (*Id.*) While there is evidence to support a finding of a conflict of interest, there was nevertheless a failure by the members of the Management Committee to consent to or approve of the sale of the Joint Venture within ten days after the action was proposed.

Thus, the Court does not find a likelihood of success on the merits for purposes of expedited emergency relief as to this claim.

### c. Whether RMS Australia Lacked Standing to Trigger the Put-Call Provision

Next, Plaintiff asserts RMS Australia lacked standing under the Operating Agreement to trigger the Put-Call provision. (Doc. No. 8-1 at 16.) Specifically, because RMS Australia improperly transferred a portion of its equity interest to Advent and Ascott, it lost its ability to trigger the Put-Call provisions. (*Id.*) In response, RMS Australia asserts Article 11 of the Operating Agreement imposes conditions only upon a Member's disposition of its own Membership Interests, and says nothing about any requirements of the ownership structure relating to the Members themselves. (Doc. No. 16 at 26.)

Here, Article 11 of the Operating Agreement states: "Any Member or Assignee may dispose of all or a portion of the *Membership Interest* of that Member or Assignee upon compliance with this Section 11.1" (Operating Agreement § 11.1 (emphasis added).) Indeed, the Operating Agreement is silent as to the requirements of the ownership structure relating to the Members themselves. This is unlike the facts of *Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95 (Del. Ch. 2006), in which the court found the defendant breached the explicit terms of the LLC Agreement, stating, "[e]ach of these breaches implicated a clear contractual goal of Eureka evinced in the LLC Agreement, which was to ensure that it would not find itself jointly owning Niagara Redevelopment with a partner it did not approve." *Eureka*, 899 A.2d at 97. Moreover, the court noted "the LLC

16

Agreement contained a number of provisions designed to ensure that Eureka would be protected if Cogan ceased to have effective control of Holdings" and that these "provisions, taken together, make clear that Eureka intended to be partners with Cogan, not strangers." *Id.* at 99. However, in the instant case, Plaintiff has not pointed the Court to any similar provision in the Operating Agreement.

Thus, the Court does not find a likelihood of success on the merits for purposes of expedited emergency relief as to this claim.

### d.   Whether Plaintiff Has a Viable Breach of Fiduciary Duty Claim

Finally, Plaintiff asserts it is likely to establish that it complied with all obligations under the Operating Agreement and is entitled to the benefit of its bargain, and that RMS Australia breached its fiduciary duties owed to Plaintiff in a number of instances. (Doc. No. 8-1 at 17.) RMS Australia responds that the Complaint does not assert a viable breach of fiduciary duty claim for two reasons. (Doc. No. 16 at 27.)

First, RMS Australia asserts the Complaint fails to allege any facts to establish it owes Plaintiff any fiduciary duties at all. (*Id.*) Plaintiff asserts in its Complaint under its claim for breach of fiduciary duty that "[m]embers of a Delaware Limited Liability Company owe each other a fiduciary duty of good faith and fair dealing, which requires parties to refrain from conduct that prevents the other party from enjoying the fruits of the endeavor." (Compl. ¶ 68.) However, the Operating Agreement, in accordance with Delaware law, greatly restricts or even eliminates fiduciary duties. Delaware's Limited Liability Act specifically provides:

> To the extent that . . . a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties *may be expanded or restricted or eliminated* by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

6 Del. C. § 18–1101(c) (emphasis added). Moreover, the Operating Agreement states:

> The only duties, including fiduciary duties, of the Members to the Company or to each other in respect of the Company shall be those established in this Limited Liability Agreement, and there shall be no other express or implied duties of the Members to the Company or each other in respect of the Company.

(Operating Agreement § 2.8.1.)  RMS Australia asserts the Complaint fails to identify any fiduciary duty provided for by the Operating Agreement. (Doc. No. 16 at 27.) To this point, RMS Australia argues that "because the Operating Agreement specifically proscribes any fiduciary duties to the 'maximum extent permitted by the law,' and because Plaintiff 'does not expressly articulate fiduciary obligations' imposed by the Agreement," its fiduciary duty claim fails. (*Id.* (quoting *Fisk Ventures, LLC v. Segal*, No. 3017–CC, 2008 WL 1961156, at *11 (Del. Ch. May 7, 2008)).) The Court agrees. Plaintiff fails to cite any provision of the Operating Agreement under which it can be alleged that RMS Australia breached its fiduciary duty to Plaintiff.

RMS Australia further argues Plaintiff's breach of fiduciary claims will fail because they are impermissibly duplicative under Delaware law. (Doc. No. 16 at 27.) Delaware courts "do[] not allow fiduciary duty claims to proceed in parallel with breach of contract claims unless there is an independent basis for the fiduciary duty claims apart from the contractual claims." *Renco Grp. Inc. v. MacAndrews AMG Holdings LLC*, No. 7668–VCN, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015) (internal quotation marks omitted). "To determine whether there is an independent basis for fiduciary claims arising from the same general events, the Court inquires whether the fiduciary duty claims depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy." *Id.* (internal quotation marks omitted).

Here, Plaintiff asserts RMS Australia breached its fiduciary duties in part by breaching its contractual obligations under the Operating Agreement, "including failure to

18

hire and train staff, to provide customization services, to provide the source code, and to keep up with its capital amount." (Compl. ¶ 70–71.) These facts and harms cited in support of the fiduciary duty claims appear to be the same ones that underlie the breach of contract claims. (*See id.* ¶ 62.) Thus, Plaintiff's breach of fiduciary duty claim is not likely to succeed on these facts. However, Plaintiff further pleads that Defendants breached their fiduciary duties "by secretly restructuring and selling off portions of RMS Australia, without any notice to or consent by Plaintiff or the Joint Venture" and "by creating a situation that allowed them to try to pressure Plaintiff into selling its interest in the Joint Venture for pennies on the dollar[.]" (*Id.* ¶¶ 72–73.) As to these assertions, Plaintiff's breach of fiduciary duty claim is not duplicative of its breach of contract claim, as these duties that Plaintiff claims it is owed do not arise from the Operating Agreement.

Based on the foregoing, the Court does not find a likelihood of success on the merits for purposes of expedited emergency relief as to Plaintiff's breach of fiduciary duty claim.

### 2.    Irreparable Harm in the Absence of a TRO

A plaintiff seeking a TRO must establish a likelihood of irreparable harm in the absence of relief. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1242 (9th Cir. 2013). "Those seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm." *Id.* at 1251. A court may not rely on "unsupported and conclusory statements regarding harm [a plaintiff] *might* suffer." *Id.* at 1250. "[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). However, the Ninth Circuit has also "recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Id.* Similarly, "[t]he threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).

The issue of irreparable harm focuses on the harm caused by not maintaining the status quo. The Court's evaluation is guided by the general notion that "[s]elf-inflicted

wounds are not irreparable injury." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003)). Further, courts generally decline to find irreparable harm that "results from the express terms of [the] contract." *Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003).

Plaintiff asserts irreparable harm is already occurring, not only because the Joint Venture's goodwill is being eroded, but because Defendants have taken steps to dissolve the Joint Venture. (Doc. No. 8-1 at 18.) Plaintiff contends that clients have complained and left for competitors, and Defendants have terminated Joint Venture employees without any warning. (*Id.*) Ultimately, Plaintiff argues that without an injunction, it "will be drained of **all** the institutional knowledge regarding the Joint Venture and will have to start over at square one." (*Id.*) RMS Australia responds that Plaintiff's showing of irreparable harm is insufficient for three reasons. (Doc. No. 16 at 22.)

First, RMS Australia asserts Plaintiff's alleged injury is self-inflicted because the conditions that were imposed on Plaintiff by RMS Australia—the invocation of the Put-Call provisions—were the express terms of the Operating Agreement which Plaintiff itself signed, and the impact of which Plaintiff plainly acknowledged. (*Id.*) Specifically, Plaintiff was bound by the terms of the Put-Call provision to either satisfy the closing conditions as Buyer on the Closing Date, or do nothing and be deemed to have accepted the Purchase Offer. (*Id.*) These conditions were not imposed on Plaintiff, but rather were the express terms of the Operating Agreement which Plaintiff itself signed. (*Id.*); *see Salt Lake Tribune Publ'g Co.*, 320 F.3d at 1106 (finding the plaintiff could not establish irreparable harm where the alleged harm stemmed from the plaintiff's loss of control over the management of its newspaper because the change in control of the newspaper "result[ed] from the express terms of a contract it negotiated, and therefore the removal of [plaintiff's] managers is a harm that [plaintiff] inflicted upon itself").

Here, it appears RMS Australia mischaracterizes the injuries asserted by Plaintiff. Plaintiff's Complaint characterizes its injuries as the loss of value, clients, and goodwill of

20

the Joint Venture through RMS Australia's failure to meet its obligations, including its failure to provide customization services, adequate quality assurance and customer support and training, and adequate training to Joint Venture staff and clients. (Compl. ¶ 41.) Thus, the Court finds Plaintiff's alleged harms do not result from the express terms of the contract and therefore are not self-inflicted.

Next, RMS Australia asserts Plaintiff's delay in seeking injunctive relief establishes there is no irreparable harm. (Doc. No. 16 at 23.) Specifically, Plaintiff has been aware of the Put-Call Offer and the attendant possibility that the Joint Venture would sell all of its assets and dissolve since at least January 23, 2024. Thereafter, on July 21, 2024, Plaintiff rejected the Put-Call Offer and announced it would become the Buyer, to close on the acquisition by September 19, 2024. Plaintiff then filed its Complaint on August 1, 2024. However, on the closing date of September 19, 2024, Plaintiff sought an extension to the closing date, which Defendants rejected. The following day, RMS Australia executed an asset purchase agreement with P&J, pursuant to which it sold all of the Company Property of the Joint Venture, the Joint Venture voted to dissolve itself, filed a Certificate of Cancellation with the Delaware Secretary of State, and made distributions to the Members of the Joint Venture. RMS Australia also delivered a check for Plaintiff's share of the Joint Venture's assets. Plaintiff then sought injunctive relief on September 23, 2024.

"Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Here, the Court finds Plaintiff's delay does not prevent it from establishing irreparable harm because Plaintiff sought an extension on September 19, 2024, which was rejected that day, and Plaintiffs subsequently filed the instant application four days later, on September 23, 2024.

Finally, RMS Australia asserts Plaintiff's alleged harms of loss of the Joint Venture's goodwill and clients are speculative losses that do not amount to irreparable injury. (Doc. No. 16 at 23.) However, as noted above, the Ninth Circuit has determined otherwise. *See Rent-A-Ctr.*, 944 F.2d at 603 (the Ninth Circuit "recognized that intangible

injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *Am. Passage Media Corp.*, 750 F.2d at 1474 ("The threat of being driven out of business is sufficient to establish irreparable harm.") Accordingly, the Court finds this argument unavailing.

### 3. Balance of Hardships

Before issuing a TRO, courts must weigh "the competing claims of injury and [] consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987).

Plaintiff argues that if Defendants' actions are not enjoined, the Joint Venture will cease to exist altogether, and its customers and goodwill will evaporate. (Doc. No. 8-1 at 18–19.) In response, RMS Australia asserts this outcome has already occurred and is irreversible, and that Plaintiff provides no evidence for its latter assertion. (Doc. No. 16 at 29–30.) Moreover, as to Plaintiff's latter asserted harm, RMS Australia contends the Joint Venture's assets have been transferred to a new entity, and those of the Joint Venture's former staff who were offered employment with the new entity have accepted. (Buttigieg Decl. ¶¶ 25–29.) Thus, asserts RMS Australia, granting the requested relief would impose substantial hardship both on itself and the new entity's employees because the Joint Venture has already been dissolved, all of its assets have been distributed, and all but two of its former staff members are now employed by the new entity. (Doc. No. 16 at 30.)

While courts often find the balance of equities tip in favor of a party who is at risk of losing significant business goodwill, *Verliant Energy, Inc. v. Barry*, No. 14–cv–02443–JST, 2014 WL 12495077, at *1 (N.D. Cal. June 6, 2014), RMS Australia has already dissolved the Joint Venture and transferred its asserts. As such, granting the instant TRO would require RMS Australia to undo the various actions it has already taken—if feasible. Accordingly, the balance of hardship tips in RMS Australia's favor.

///

///

///

22

### 4. Public Interest

"The public interest analysis for the issuance of a [TRO] requires [district courts] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Cottrell*, 632 F.3d at 1138 (citation omitted).

Plaintiff asserts the public interest will be served by an injunction because a status quo injunction would allow the Joint Venture's clients to continue to provide services to its respective customers, while also avoid potential mass litigation that would result from a disruption. (Doc. No. 8-1 at 19.) Moreover, the injunction would allow the Joint Venture's employees to retain their jobs while this dispute is being resolved. (*Id.*) However, rather than maintaining the status quo, Plaintiff's TRO requests the Court to undo the actions already taken by RMS Australia. Moreover, Plaintiff fails to offer evidence of its claims that granting an injunction would serve the public interest. *See Zoom Video Commc'ns, Inc. v. RingCentral, Inc.*, No. 5:21-cv-01727-EJD, 2021 WL 1376031, at *7 (N.D. Cal. Apr. 12, 2021) ("Even if true, the facts currently in the record do not establish that any public interest is at stake in this commercial dispute which would outweigh RingCentral's insufficient showing as to the other factors.").

## IV. CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiff's *ex parte* application for a temporary restraining order.

**IT IS SO ORDERED.**

Dated:  October 15, 2024

Hon. Anthony J. Battaglia
United States District Judge

23